IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JERMAINE JACKSON, | ) | CASE NO. 1:22-CV-01789-JRA |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | JOHN R. ADAMS |
| v. | ) | |
| | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

**I. INTRODUCTION**

Plaintiff Michael J. Jackson ("Mr. Jackson") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge John R. Adams has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

**II. PROCEDURAL HISTORY**

On August 17, 2020, Mr. Jackson filed applications for DIB and SSI, alleging a disability onset date of May 27, 2020, due to a combination of impairments, including congestive heart failure, high blood pressure, and blood clots. (Tr. 190-206).[1] Both applications were denied

---
[1] The administrative transcript ("Tr.") is located at ECF Doc. 7 on CM/ECF.

1

initially and upon reconsideration. (Tr. 93-102, 104-12). Mr. Jackson requested a hearing before an administrative law judge ("ALJ"). (Tr. 112-16). On August 23, 2021, the ALJ held an online video hearing due to the COVID-19 pandemic, during which Mr. Jackson, represented by counsel, and a vocational expert ("VE") testified. (Tr. 31-50).

On August 31, 2020, the ALJ issued a written decision finding that Mr. Jackson was not "disabled" under the Social Security Act. (Tr. 13-30). The ALJ's decision became final on August 8, 2022, when the Appeals Council denied further review. (Tr. 1-7). Mr. Jackson asserts the following assignment of error:

> (1) The ALJ's RFC determination is the product of legal error and therefore not supported by substantial evidence because the ALJ failed to properly evaluate and reconcile the opinions of Dr. Mark Angel, M.D., treating cardiologist, pursuant to the regulations.

(ECF Doc. 8, PageID#874).

### III. BACKGROUND INFORMATION

#### A. Personal, Educational, and Vocational Experience

Mr. Jackson was born in 1972, and he was 48 years on the alleged disability onset date. (Tr. 24). He has an eleventh-grade education, and he does not have a GED. (Tr. 37). He is married and has three children. (*Id.*). At the time of the hearing, Mr. Jackson had a driver's license. (*Id.*). His past relevant work was employment as a lead metal pourer, machine operator, molder/pourer, and foundry operator. (Tr. 221-22).

#### B. Relevant Hearing Testimony

##### 1. *Mr. Jackson's Testimony*

Mr. Jackson testified that he was unable to return to work in 2021 because he had another heart attack "which required [him] to return with the [L]ife[V]est[2] and [he] was taken off of – [he] was unable to work because [his] heart was too weak." (Tr. 35). He stated that – after his most recent heart attack – his cardiologist recommended that Mr. Jackson walk a minimum of half a block, and that he would then be cleared to return to work once "[his] heart comes back up to a working level." (*See id.*). He testified that he had been prescribed a LifeVest in January 2021, approximately seven months prior to the administrative hearing. (Tr. 36). Mr. Jackson further testified that he had an upcoming appointment with his cardiologist in November 2021 to discuss potentially implanting a pacemaker/defibrillator due to Mr. Jackson's arrythmia and other heart issues. (*Id.*).

Mr. Jackson also testified about the symptoms he was experiencing due to his cardiac issues. (*Id.*). He testified that he has shortness of breath. (*Id.*). He elaborated that, during a regular grocery store visit, he can "maybe walk down maybe two aisles but now [has] to cope with the riding in the carts." (*Id.*). He testified that his cardiologist did not want him "moving, bending, squatting, [or] doing anything strenuous" and placed him on a ten-pound lifting restriction. (Tr. 36, 38).

With respect to taking care of his personal needs, Mr. Jackson testified that he is able to wash, bathe, and dress himself. (Tr. 38). However, he testified that he sporadically experiences shortness of breath where "[his] heart will just start racing, beating very fast." (*Id.*). He testified that some of his medications cause drowsiness if he has eaten, but he experiences no other side

---

[2] A LifeVest is a personal defribillator that an individual at risk for sudden cardiac arrest wears "while waiting for a more permanent solution," which monitors the individual's heart rate. If a life-threatening arrhythmia starts, the LifeVest will deliver a shock treatment to restore the individual's heart to normal rhythm. *See* Cleveland Clinic, LifeVest, https://my.clevelandclinic.org/health/treatments/17173-lifevest (last visited Aug. 7, 2023).

3

effects. (Tr. 39). He testified that he becomes dizzy when he sits outside in the sun for too long. (*Id.*).

### 2. *Vocational Expert's Testimony*

The vocational expert (the "VE") testified that Mr. Jackson's past relevant work was employment as a pelletizer and metal finisher. (Tr. 43). As a first hypothetical, the ALJ asked the VE whether a hypothetical individual with Mr. Jackson's age, education, and work experience could perform work at the sedentary exertional level, except he can never climb ladders, ropes, or scaffolds, or crawl; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; have no concentrated exposure to temperature extremes, humidity, or environmental pollutants; and have no exposure to hazards like heights, machinery, and commercial driving. (Tr. 44-45). The VE opined that this individual could not perform past work, but prior to the age of 50, this individual could perform work as a charge account clerk, food and beverage order clerk, and document specialist. (Tr. 45-46).

For the second hypothetical, the ALJ asked whether a hypothetical individual with the same limitations as the first hypothetical, but with the additional limitation of being off-task at least 20% of the workday due to symptoms of medically determinable impairments, could perform jobs existing in significant numbers in the economy. (Tr. 46). The VE opined that the hypothetical individual could not do so. (*Id.*).

### C. Relevant Non-Medical/Medical Opinion Evidence

### 1. *State Agency Consultants*

Dr. Dimitri Teague, M.D., a state agency physician, reviewed the record at the initial level of administrative review. Dr. Teague found that Mr. Jackson could perform work at the light exertional level, but could stand and/or walk for four hours during an eight-hour workday with

4

normal breaks; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; needed to avoid concentrated exposure to extreme heat, extreme cold, humidity, and pulmonary irritants; and needed to avoid all exposure to hazards, such as unprotected heights, heavy machinery, and commercial driving. (Tr. 54-56, 63-65). Dr. Michael Lehv, M.D., affirmed Dr. Teague's findings at the reconsideration level. (Tr. 71-73, 79-81).

### 2. *Dr. Mark Angel, M.D.*

On August 25, 2020, Dr. Angel indicated that Mr. Jackson had the following diagnoses: ischemic cardiomyopathy, ST-elevation myocardial infarction ("STEMI")[3], coronary artery disease, a stent placement in the left ascending artery ("LAD"), and hypertension. (Tr. 292). Dr. Angel opined that Mr. Jackson's symptoms associated with his impairments were severe enough to "constantly" interfere with the attention and concentration required to perform simple work-related tasks. (*Id.*). Dr. Angel additionally opined that Mr. Jackson would need to recline or lie down during an 8-hour day in excess of the typical 15-minute break in the morning, the 30- to 60-minute lunch, and the typical 15-minute break in the afternoon because he "fatigues easily." (*See id.*). Dr. Jackson opined that Mr. Jackson had the following limitations: he could walk no more than one block without rest or significant pain; could sit for one hour and stand/walk for zero hours during an eight-hour workday; would require 15- to 30-minute breaks every hour; could occasionally lift up to ten pounds; would have limitations with repetitive manipulative tasks due to becoming easily fatigued, and so could perform such tasks 10% of the day; and would be absent from work more than four times per month. (Tr. 292-93).

---

[3] An ST-elevation myocardial infarction is a type of heart attack that involves the total blockage of a coronary artery (one of the heart's main supply arteries). *See* Cleveland Clinic, STEMI Heart Attack, https://my.clevelandclinic.org/health/diseases/22068-stemi-heart-attack (last visited Aug. 8, 2023).

5

On January 18, 2021, however, Dr. Angel released Mr. Jackson to return to work without restrictions. (Tr. 531).

### D. Relevant Medical Evidence

On May 28, 2020, Mr. Jackson visited an emergency room with complaints of chest pain. (Tr. 323). On examination, Mr. Jackson presented as obese and tachycardic. (*Id.*). He was initially treated in the emergency department with nitroglycerin, Lisinopril, and Metoprolol. (Tr. 328). He then underwent left heart catheterization, a selective coronary arteriogram, a left ventriculogram, and placement of a drug-eluting stent. (Tr. 320-22). The procedure revealed severe left anterior descending and diagonal branch disease, culprit vessel; moderate luminal irregularity of circumflex coronary artery; moderate diffuse luminal irregularity of the right coronary artery; and dilated left ventricle demonstrating anteroapical hypokinesis and ejection fraction of 40%. (Tr. 283). These findings were deemed consistent with an ischemic cardiomyopathy with LAD territory infarction and a severely dilated left ventricle with moderately impaired function. (Tr. 284). The procedure was successful. (Tr. 320-22). Mr. Jackson was prescribed Xarelto, Brilinta, Lisinopril, Aldactone, and aspirin at discharge on May 31, 2020. (Tr. 335, 342). At discharge, Mr. Jackson reported he was independent, employed, able to drive, and had no concerns. (Tr. 341).

On June 17, 2020, Mr. Jackson presented for a cardiac MRI that revealed findings consistent with an ischemic cardiomyopathy LAD territory infarction. (Tr. 363). The left ventricle was noted to be severely dilated. (*Id.*).

On August 24, 2020, Mr. Jackson returned to care with Dr. Angel. (Tr. 286). His reported symptoms and physical examination were unchanged. (Tr. 286-87). Dr. Angel noted "[t]he patient remains stable at today's visit, with no signs of cardiac decompensation." (Tr. 288). Dr. Angel recommended regular physical activity and weight loss. (Tr. 287). Dr. Angel prescribed increased

6

dosages of Zestril and Toprol and stated he would attempt to increase Mr. Jackson's medications in four weeks. (Tr. 288). Dr. Angel completed a Physical Assessment form on August 25, 2020. (Tr. 290-93).[4]

On October 20, 2020, Mr. Jackson returned for a cardiology follow-up appointment with Dr. Angel. (Tr. 492). Dr. Angel noted that "[t]he patient ha[d] no cardiac symptoms at this time." (*Id.*). Dr. Angel advised Mr. Jackson to manage his weight and maintain regular physical activity. (Tr. 491). Dr. Angel increased Mr. Jackson's Aldactone dosage. (*Id.*).

On November 20, 2020, Mr. Jackson attended another cardiology follow-up appointment with Dr. Angel. (Tr. 506). The examination revealed an apex beat that was not localized; no cardiac thrill; normal heart rate; no heart murmur; and no pericardial friction rub. (*Id.*). Dr. Angel noted that the "patient remains stable at today's visit, with no signs of cardiac decompensation." (*Id.*). Dr. Angel advised Mr. Jackson to continue his current medication regimen. (*Id.*). Dr. Angel also advised Mr. Jackson that he could discontinue use of the LifeVest. (*Id.*). Finally, Dr. Jackson diagnosed Mr. Jackson with acute thrombus of the left ventricle with acute myocardial infarction, ischemic cardiomyopathy, obesity, STEMI, coronary artery disease, pure hypercholesterolemia, essential hypertension, and presence of drug coated stent in LAD coronary artery. (Tr. 506-07).

On January 18, 2021, Mr. Jackson contacted the Cleveland Clinic, reporting he had been released to return to work without restrictions by Dr. Angel on November 20, 2020, and requesting a letter to that effect. (Tr. 531). Dr. Angel drafted and provided the letter to Mr. Jackson. (*Id.*).

On March 18, 2021, Mr. Jackson presented for an x-ray of the right knee that revealed severe degenerative arthritis. (Tr. 556).

---

[4] The August 25, 2020 Physical Assessment form is summarized in the "Relevant Non-Medical/Medical Opinion Evidence" section of this Report and Recommendation.

On March 26, 2021, Mr. Jackson was assessed with primary osteoarthritis of the right knee and anemia. (Tr. 604).

On April 2, 2021, Mr. Jackson sought emergency care for "moderate" chest pain, shortness of breath, coughing, and hematuria. (Tr. 613, 614). He presented as mildly hypertensive and tachycardic. (Tr. 614-15). Mr. Jackson's physical examination revealed tachycardia and rhythm "irregularly irregular." (Tr. 615). His radial pulse, dorsalis pedis pulse, and posterior tibial pulse was 2+ bilaterally. (*Id.*). His cardiac enzymes were mildly elevated but not trending upwards. (Tr. 617). Mr. Jackson's echocardiogram showed a left ventricular ejection fraction of 30%. (Tr. 681). An emergency care provider indicated that Mr. Jackson's echocardiogram showed "lower [ejection fraction] but no thrombus." (Tr. 591). Mr. Jackson was discharged on April 5, 2021. (Tr. 591). At discharge, Mr. Jackson's Xarelto was discontinued, and his medical provider advised him to resume his pre-hospitalization activity. (Tr. 591, 620).

On May 7, 2021, Mr. Jackson returned to Dr. Angel for a cardiac follow-up appointment. (Tr. 548). He reported impaired exercise tolerance, but he denied chest pain/discomfort, dyspnea at rest, and/or fatigue. (Tr. 550). His physical examination was unremarkable. (*See* Tr. 552-53). Dr. Angel noted that Mr. Jackson was stable, with no signs of cardiac decompensation, and Dr. Angel advised Mr. Jackson to continue his current medication regimen. (Tr. 553). Dr. Angel also advised Mr. Jackson to follow up in eight weeks and undergo a repeat ECHO. (*Id.*). If Mr. Jackson's ejection fraction improved, Dr. Angel advised that Mr. Jackson should discontinue use of the LifeVest. (*Id.*). However, Dr. Angel said that if Mr. Jackson's ejection fraction remained persistently below 35%, Dr. Angel would consider a permanent implantable cardioverter-defibrillator. (*Id.*).

## IV.  THE ALJ'S DECISION[5]

In his August 2021 decision, the ALJ determined that Mr. Jackson had not engaged in substantial gainful activity since May 27, 2020, the alleged onset date. (Tr. 18). The ALJ further determined that Mr. Jackson had the following severe impairments: status post myocardial infarction; coronary artery disease, status post angioplasty with stent placement; ischemic cardiomyopathy with tachycardia; degenerative arthritis of the right knee; and obesity. (*Id.*). The ALJ, however, found none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix. (Tr. 19). The ALJ also determined that Mr. Jackson could perform sedentary work, except that he can never climb ladders, ropes, or scaffolds; never crawl; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; have no concentrated exposure to temperature extremes, humidity, or environmental pollutants; and have no exposure to hazards such as heights, machinery, and commercial driving. (*Id.*).

The ALJ next determined that Mr. Jackson is unable to perform any past relevant work. (Tr. 23). He also determined that transferability of job skills is not an issue in this case because using the Medical-Vocational Rules as a framework supports a finding that Mr. Jackson is not disabled. (Tr. 24). Considering Mr. Jackson's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that Mr. Jackson could perform, including employment as a charge account clerk, food and beverage order clerk, and document specialist. (Tr. 24-25). Accordingly, the ALJ concluded that Mr. Jackson was not disabled. (Tr. 25).

---

[5] The ALJ's findings are summarized.

9

V. **LAW AND ANALYSIS**

A. <u>**Standard of Review**</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the

10

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. The ALJ Did Not Err in Evaluating Dr. Angel's Opinion

Mr. Jackson challenges the ALJ's evaluation of Dr. Angel's opinion as not persuasive. (ECF Doc. 8, PageID#881-85). Mr. Jackson argues the ALJ erred in finding the opinion not persuasive because the ALJ's analysis was cursory, did not cite to specific records as evidence in support of his persuasiveness determination, and overlooked evidence that was consistent with and supported Dr. Angel's opinion. (ECF Doc. 8, PageID#881-85). In response, the Commissioner contends that the ALJ properly applied the legal standards and identified substantial evidence in support of his finding. (ECF Doc. 9, PageID#896-901). The Commissioner also argues that, even if the ALJ erred, Mr. Jackson failed to show how the ALJ's failure to adopt temporary restrictions not lasting for a continuous period of 12 months was harmful. (*Id.*).

On reply, Mr. Jackson largely reiterates his merits briefs arguments regarding the supportability and consistency of Dr. Angel's opinion. (ECF Doc. 10, PageID#904-05). He further asserts that the Commissioner merely restates the medical evidence without demonstrating that the ALJ created an accurate and logical bridge between the evidence and the result. (*Id.* at PageID#906). Finally, he asserts that the Commissioner is relying upon impermissible *post-hoc* rationalization to cure the ALJ's failure to articulate how the ALJ considered the consistency and supportability of Dr. Angel's opinion. (*Id.* at PageID#907).

The Social Security Administration's regulations governing the evaluation of medical opinions provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, No. 4:19-CV-0058-HBB, 2020 WL 1151069, at *4 (W.D. Ky Mar. 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)). The five factors are supportability, consistency,

relationship with the claimant, specialization, and other factors, with supportability and consistency acknowledged to be the most important factors for consideration. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).

An ALJ is required to explain how he considered consistency and supportability. 20 C.F.R. § 404.1520c(b)(2). He "may, but [is] not required to, explain how [he] considered the [other] factors." *Id.* The regulations define "supportability" as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). The regulations define "consistency" as "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Here, the ALJ analyzed the persuasiveness of Dr. Angel's opinion as follows:

On August 25, 2020, Dr. Angel completed a form about the claimant's physical capabilities. Dr. Angel provided diagnoses of ischemic cardiomyopathy, STEMI, coronary artery disease, stent in LAD, and hypertension. Dr. Angel expressed the following medical opinion: the claimant's symptoms associated with his impairments are severe enough to "constantly" interfere with attention and concentration required to perform simple work-related tasks; cardiac medications "may" cause dizziness and drowsiness; he would need to recline or lie down during the workday in excess of typical breaks/lunch due to fatigue (hourly for 15 to 30 minutes); he can sit for 1 hour of an 8-hour workday and cannot walk or stand; he can occasionally lift/carry 10 pounds; he can use his hands, fingers, and arms only 10% of an 8-hour workday because he fatigues easily; and he will likely be absent from work more than four times a month due to impairments or treatments (2F/3-4).

Dr. Angel's medical opinion is not persuasive because such severe and extreme limitations are not supported by the treatment note dated August 24, 2020. Although the claimant endorsed impaired exercise tolerance, he denied fatigue and he appeared healthy and alert. Furthermore, the physical examination was

13

> unremarkable (see above). Dr. Angel's medical opinion is not persuasive because such severe and extreme limitations are not consistent with the limited course of treatment.

(Tr. 21).

Mr. Jackson argues that this analysis is vague, mischaracterizes the evidence, and lacks sufficient specificity for this Court to conduct a meaningful review. His arguments regarding the consideration of the supportability and consistency factors will be addressed below.

### 1. *Supportability Analysis*

Mr. Jackson contends that Dr. Angel's "contemporaneous treatment records actually provide support for the assessed opinion." (ECF Doc. 8, PageID#882). In support, Mr. Jackson cites to diagnoses of acute thrombus of the left ventricle with acute myocardial infarction and ischemic cardiomyopathy; an increase in his medication dosages; and a statement by Dr. Angel that Mr. Jackson was to return for an appointment in four weeks to discuss further increasing his medications. (*Id.* at PageID#882-83 (citing Tr. 301-302, 304)).

To articulate a decision supported by substantial evidence, the Sixth Circuit has observed that an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). An ALJ may also rely on previously articulated information to support his opinion analysis. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (unpublished) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc.*

*Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to required the ALJ to "spell out every fact a second time").

Here, the ALJ explained the supportability factor by stating that Dr. Angel's "severe and extreme limitations are not supported by the treatment noted dated August 24, 2020." (Tr. 21). Specifically, the ALJ, referring to his earlier discussion of the treatment note in his decision, offered substantial evidence by highlighting findings from Dr. Angel's treatment note that – despite Mr. Jackson endorsed impaired exercise tolerance – he denied fatigue and appeared healthy and alert. (Tr. 21; *see* Tr. 302-03). Further, the ALJ observed that Mr. Jackson's August 2020 physical examination was unremarkable. (Tr. 21; *see* Tr. 303-04). Thus, the ALJ addressed the evidence upon which Dr. Angel's August 25, 2020, opinion was based.

Although Mr. Jackson points to certain pieces of evidence within the treatment note that he believes "actually provide support for the assessed opinion," the ALJ adequately explained the supportability factor in his evaluation of Dr. Angel's opinion. Significantly, some of the evidence that Mr. Jackson relies upon was discussed by the ALJ. For example, the ALJ did not mischaracterize the treatment note and indicated that Dr. Angel increased Mr. Jackson's medications. (*See* Tr. 21 ("Dr. Angel reviewed the claimant's medication regimen and increased Toprol XL, increased Zestril, and added Zetia.")). Mr. Jackson offers no clear reasoning on how his cited evidence from Dr. Angel's treatment note contradict the ALJ's reasoning. While he points to heart diagnoses from the treatment note, he does not acknowledge that the very same treatment note indicated that Mr. Jackson denied experiencing significant cardiac symptoms, such as chest pain, dizziness, and fatigue. (Tr. 302-03). In addition, to the extent that Mr. Jackson attempts to argue that the ALJ should have cited other evidence that Mr. Jackson viewed as favorable to his claim, an ALJ is not "required to discuss each piece of data in its opinion, so long as they consider

the evidence as a whole and reach a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky*, 167 F. App'x at 507-08).

Further, as stated above, the ALJ offered evidence from the treatment note demonstrating that Dr. Angel's opinion was not supported by his own August 24, 2020 treatment note. (Tr. 21). Reweighing evidence is not permitted at this stage of review. *See Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018) ("We decide only whether there was substantial evidence to support the ALJ's RFC determination. If so, we defer to that decision even in the fact of substantial evidence supporting the opposite conclusion.") (internal citations omitted); *Harrod v. Comm'r of Soc. Sec.*, No. 3:17CV1839, 2018 WL 3869897, at *16 (N.D. Ohio Aug. 15, 2018) ("Although Plaintiff clearly believes the ALJ should have assessed more restrictive limitations based on her interpretation of the medical record, that belief does not establish a violation of the substantial evidence standard."). Thus, Mr. Jackson does not meet his burden of demonstrating that the ALJ's consideration of the supportability of Dr. Angel's opinion lacked the support of substantial evidence. The ALJ's decision is not subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).

Even if there is evidence to support the opposite conclusion, this does not establish a violation by the ALJ here because the ALJ addressed the relevant evidence and provided an accurate and logical bridge for his finding that Dr. Angel's opinion was unsupported.

### 2. *Consistency Analysis*

Mr. Jackson next argues that the ALJ's consistency analysis was "even more egregious" because the ALJ failed to cite any record evidence (ECF Doc. 8, PageID#883). He contends that the ALJ ignored and failed to cite several other objective tests, examinations, and findings dated

16

after Dr. Angel's August 25, 2020, opinion in the ALJ's persuasiveness evaluation. (*Id.* (citing Tr. 548, 553, 556, 591, 604, 615, 664)).

The ALJ's consistency analysis stated that Dr. Angel's "severe and extreme limitations [we]re not consistent with the limited course of treatment." (Tr. 21). First, Mr. Jackson contends that the ALJ failed to cite any records in his persuasiveness evaluation. But this argument takes a narrow approach to the ALJ's decision. As stated previously, it is well-settled that courts must read the ALJ's decision as a whole and with common sense. *See Crum*, 660 F. App'x at 457. Reading the decision here as a whole, the ALJ detailed the chronological history of Mr. Jackson's limited course of treatment, which included discussion of Dr. Angel's August 2020 opinion, and highlighted evidence demonstrating the inconsistency of Dr. Angel's opinion in the ALJ's decision. Specifically, the ALJ discussed how Mr. Jackson's denied several cardiac symptoms including chest pain, shortness of breath, and dizziness at visits with Dr. Angel from August 2020 to November 2020. (Tr. 20-21; *see* Tr. 299-305, 486-92, 504-07). The ALJ also highlighted the absence of significant cardiac abnormalities during Mr. Jackson's routine physical examinations. (Tr. 20-22; *see* Tr. 299-305, 486-92, 548-54). Further, the ALJ observed that "[s]ignificantly, on January 18, 2021, Dr. Angel released [Mr. Jackson] to work" after the issuance of his August 2020 opinion. (Tr. 22; *see* Tr. 531).

Next, I agree with the Commissioner that Mr. Jackson fails to provide meaningful explanation as to how the cited evidence that he alleges the ALJ did not consider (all dated *after* Dr. Angel's August 2020 opinion) demonstrates the consistency of Dr. Angel's opinion. For example, Mr. Jackson cites records related to orthopedic impairments (*i.e.*, a knee x-ray revealing severe degenerative arthritis and a hospital note assessing primary osteoarthritis of the right knee). (ECF Doc. 8, PageID#883 (citing Tr. 556, 604)). But Dr. Angel did not base his opinion on those

17

physical impairments. Rather, Dr. Angel's August 25, 2020, opinion only identified Mr. Jackson's cardiovascular diagnoses of ischemic cardiomyopathy, STEMI, coronary artery disease, stent placement in the LAD, and hypertension. (*See* Tr. 292).

Further, the other evidence Mr. Jackson cites dating from March to May 2021 occurred *after* Dr. Angel released Mr. Jackson to work with no restrictions in January 2021. (Tr. 531). And while Mr. Jackson points to evidence from his April 2021 hospitalization, the ALJ – when finding the objective medical evidence and the course of treatment inconsistent with the disabling physical impairment or disabling pain/disabling shortness of breath – noted that this was caused by Mr. Jackson's failure to take his medication on a regular basis. (Tr. 22; *see* Tr. 591, 615). And even after the April 2021 hospital visit, Mr. Jackson had a May 2021 follow-up appointment where Dr. Angel observed that Mr. Jackson endorsed impaired exercise tolerance but denied chest pain/discomfort, dyspnea at rest, and/or fatigue. (Tr. 22; *see* Tr. 551-52). Dr. Angel also noted that Mr. Jackson remained stable with no signs of cardiac decompensation. (Tr. 22; *see* Tr. 551-52).

Even if a preponderance of evidence supported Mr. Jackson's argument, the Commissioner's decision should not be overturned "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Reviewing the decision as a whole, the ALJ articulated adequate reasoning for why Dr. Angel's limitations were not consistent with other evidence in the record, and this reasoning is supported by substantial evidence. Thus, I find that Mr. Jackson's consistency argument lacks merit.

Finally, the Commissioner argues that even if the ALJ had erred in his opinion evaluation, this evaluation would be harmless because Dr. Angel released Mr. Jackson fewer than twelve months after Dr. Angel's August 2020 opinion. (ECF Doc. 9, PageID#901). I agree. As noted by the ALJ, Dr. Angel released Mr. Jackson to return to work in January 2021, fewer than twelve

months after the August 2020 opinion. (Tr. 21; *see* Tr. 531). The Social Security regulations provide that impairments must last or be expected to last for a continuous period of 12 months to qualify as a disability. *See* 42 U.S.C. § 423(d)(1)(A); *Powell v. Comm'r of Soc. Sec.*, No. 5:18-CV-00776-WHB, 2019 WL 1923303, at *2 (N.D. Ohio Apr. 26, 2019); *Joseph W. v. Comm'r of Soc. Sec.*, No. 6:20-CV-06589-EAW, 2022 WL 4462236, at *6 (W.D.N.Y Sept. 26, 2022). Accordingly, I recommend that the Court find that Mr. Jackson's assignment of error lacks merit.

## VI.  RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

Dated: August 14, 2023

s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.  NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a

> determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).